## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

FRANKLIN CAPITAL FUNDING,
LLC, a Delaware limited liability
company,

   Plaintiff,

v.

AUSTIN BUSINESS FINANCE, LLC,
a Texas limited liability company; and
MXT SOLUTIONS, LLC, a Texas
limited Liability company,

   Defendants.

Case No. 2:22-cv-10947-DML-DRG

Honorable David M. Lawson

Magistrate Judge David R. Grand

**PLAINTIFF FRANKLIN CAPITAL
FUNDING, LLC'S FIRST
AMENDED COMPLAINT**

**PLAINTIFF FRANKLIN CAPITAL FUNDING, LLC'S
<u>FIRST AMENDED COMPLAINT</u>**

Plaintiff Franklin Capital Funding, LLC complains against defendants Austin Business Finance, LLC ("Austin") and MXT Solutions, LLC ("MXT") as follows:

<u>PARTIES</u>

1.      Franklin Capital Funding, LLC is a Delaware limited liability company that maintains its principal place of business in Oakland County, Michigan. Franklin Capital Funding, LLC, along with its affiliates, including Franklin Capital Group, LLC, has made and serviced a loan to non-party Excell Auto Group, Inc. ("Excell"). For ease of reference, the Franklin entities will be referred to as "Franklin" throughout this complaint.

2.      Franklin Capital Funding, LLC is a Delaware limited liability company with its principal place of business in Michigan whose members are Franklin Capital Holdco, LLC (also a Delaware limited liability company) and Franklin Holdco, LLC (a Michigan limited liability company). Franklin Capital Holdco, LLC's members are Bluestone Franklin Investor LLC (a Delaware limited liability company), L B & W Group LLC (a Delaware limited liability company), and Maven Business Ops LLC (a Delaware limited liability company). None of the ultimate individual members of Bluestone Franklin Investor LLC, L B & W Group

LLC, or Maven Business Ops LLC are citizens or residents of the State of Texas. The member of Franklin Holdco, LLC is Avrohom Baum, who is a Michigan resident.

3.     Upon information and belief, Austin is a Texas limited liability company whose members are GetBackd, Inc. (a Texas corporation with its principal place of business in Texas), Xan Myburgh (a citizen of Texas), Michail Myburgh (a citizen of Texas), Tucker Sulzberger (a citizen of Texas), Natalie Cawood (a citizen of Texas), Michael Du Plooy (a citizen of Texas), and Caleo Capital Investment, LLC. Upon information and belief, the ultimate individual members of Caleo Capital Investment, LLC are citizens of the State of Texas or citizens of foreign states who are not lawfully admitted to the United States for permanent residence.

4.     Upon information and belief, MXT is a Texas limited liability company whose sole member is Austin.

5.     As described below, discovery has shown, and additional discovery will confirm, that Austin and MXT are alter egos of each other with common ownership, officers, and office space, among other factors.

6.     Upon information and belief, both Austin and/or MXT do business under the assumed name of "GetBackd."

4857-4607-7749.v4

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney fees.

8.      The Court has personal jurisdiction over Austin and its subsidiary and alter ego, MXT, because they have transacted business within the state under M.C.L. 600.715(1). In particular, they have solicited business within the state and have entered into a contract to be performed in the state.

9.      Further, the Court has personal jurisdiction over Austin and its subsidiary and alter ego, MXT, because Austin entered into a contract with Franklin that included consent to the Court's jurisdiction.

10.     The Court also has personal jurisdiction over Austin and MXT because they have done or caused an act to be done, or consequences to occur, in the state resulting in an action for tort under M.C.L. 600.715(2).

11.     Venue is proper in the Court under 28 U.S.C. § 1391(b)(2) because, as described below, this judicial district is where a substantial part of the events or omissions giving rise to the claim occurred.

4857-4607-7749.v4

12.     In addition, Austin and its subsidiary and alter ego, MXT, consented to venue in the Court and state courts located in Oakland County, Michigan in its contract with Franklin.

## GENERAL ALLEGATIONS

**A. The Parties.**

*1. Franklin.*

13.     Franklin is a private company that makes and services small business loans.

14.     Franklin provides original loans by first engaging in a thorough underwriting review of the business applicant to ensure that the business qualifies to receive the loan. If a business applicant meets Franklin's underwriting requirements, Franklin typically agrees to loan the business customer a principal amount. The business customer, on the other hand, typically agrees to repay Franklin the principal amount plus interest in equal monthly payments over a fixed term, in accordance with the parties' written agreements.

15.     In connection with the funding of its loans, Franklin also purchases existing financing obligations owing by the business customer to other creditors and either maintains, or consolidates, such obligations into its loans to such customer.

4857-4607-7749.v4

16.     Of critical importance to Franklin in its underwriting of loans is to ensure that its business customer is in a position to repay its loan and that there is adequate security available to Franklin to safeguard repayment. Critical to that concern is Franklin's ability to control or limit its borrowers' ability to borrow additional money from sources other than Franklin.

### 2. Defendants.

17.     Defendants, on the other hand, are merchant cash advance funding companies that operate throughout the United States, including Michigan.

18.     A merchant cash advance is an agreement in which merchants can receive cash much more quickly with less underwriting than traditional loans offered by conventional financial institutions, but it comes with a cost.

19.     Under a merchant cash advance agreement, a funding company agrees to purchase a business customer's receivables at a discounted cash purchase price. For example, a funding company could purchase $25,000 of a business customers' receivables at the discounted cash purchase price of $20,000. The business customer receives the discounted cash purchase price, and the funding company debits the business customer's bank account for a certain percentage of the business customer's business either daily or weekly until the purchase price is repaid.

4857-4607-7749.v4

20.     Such merchant cash advance funding companies currently are under intense scrutiny for what legislators and regulators have deemed heavy-handed lending and collection tactics. Merchant cash advance funding companies advance money at exorbitant interest rates and often require borrowers to execute a confession of judgment or consent to other legal process as a condition to obtaining the funds, opening the door for rampant abuse of power. Funding companies have been known to forge documents, lie about how much is owed, and fabricate defaults to convince a court, typically in New York, to obtain a judgment. *See, e.g.,* the Bloomberg article titled, "I hereby confess judgment" and the Yahoo! Finance article titled, "'We're coming after you': Inside the merchant cash advance industry." A borrower never even has a chance to dispute whether it committed a default or the amount outstanding before the merchant cash advance funding company seizes all of its assets.

**B. Franklin purchased the obligations of non-party Excell and its affiliates to defendants and all related rights and holds a superior security interest in their accounts.**

21.     This action concerns the accounts of non-party Excell and its affiliates.

22.     In November 2021, Excell obtained a loan from Franklin Capital Group, LLC and granted Franklin, among other things, a security interest in its accounts receivable and those of its affiliates as collateral.

6

23.     Concurrently, Franklin purchased certain merchant cash advance obligations of Excell and its affiliates from defendants, including any security interests that they had granted to defendants in their accounts receivable, among other collateral, and the parties agreed that defendants would not enter into any other agreements with Excell or its affiliates or otherwise interfere with Franklin's collateral.

24.     Franklin Capital Group, LLC was the original lender on the face of the loan documents, but it has assigned all of its right, title, and interest in the loan and other documents related to the Excell loan transaction to Franklin Capital Funding, LLC.

### 1. *Franklin's loan to Excell.*

25.     On or about November 3, 2021, Excell executed and delivered to Franklin a Promissory Note (Term Loan) evidencing a loan in the original principal amount of $6,000,000 ("Note"). A copy of the Note is attached as **Exhibit A**.

26.     To further evidence the terms of the loan from Franklin, including all present and future loans may advance or purchase, Franklin and Excell executed a loan agreement dated November 3, 2021 ("Loan Agreement"). A copy of the Loan Agreement is attached as **Exhibit B**.

4857-4607-7749.v4

27.     In executing the Loan Agreement, Excell represented and warranted to Franklin that it would not incur any debts beyond its ability to pay, that there were no other non-permitted security interests covering its assets, and that Excell would keep its assets unencumbered. *Id.* at p. 5, ¶ 3(h), (i); p. 9, ¶ 4(j).

28.     As security for the loan, Excell and its affiliates, Karma of Palm Beach, Inc. and Karma of Broward, Inc. (collectively, "Debtor") executed and delivered to Franklin a Continuing Security Agreement dated November 3, 2021 ("Security Agreement"), in which Debtor granted Franklin a security interest in the following collateral ("Collateral"):

> (a) all of Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights …, Software … present and future …
>
> (b) all present and future insurance claims relating to any of the above;
>
> (c) all Goods, Instruments …, Documents …, policies and certificates of insurance, Deposit Accounts, and money or other property … which are now or later in possession of [Franklin], or to which [Franklin] now or later controls possession by documents or otherwise;
>
> (d) all present and future books, records, and data of Debtor relating to any of the above; and
>
> (e) all present and future accessions, additions and attachments to, proceeds, parts, products, replacement, substitutions, Supporting Obligations and rights arising out of, any of the above, including but not limited to

4857-4607-7749.v4

> stock rights, subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by Debtor.

*See* Security Agreement, attached as **Exhibit C**, at pp. 1-2, ¶ 2.

29.     Debtor represented and warranted that:

> (h) It is or will become the owner of the Collateral free from any liens, encumbrances or security interests, except for this security interest and existing liens disclosed to and accepted by [Franklin] in writing, and will defend the Collateral against all claims and demands of all persons at any time claiming any interest in it;
>
> **(i) No person, other than [Franklin], has possession or control (as defined in the UCC) of the Collateral;**
>
> **(j) It will keep the Collateral free of liens, encumbrances and other security interests. . . .**

*Id*. at pp. 3-4, ¶ 4(h)-(j) (emphasis added).

30.     Franklin perfected its security interests by filing a UCC-1 financing statement with the State of Florida as to Excell on September 9, 2021, a UCC-1 financing statement with the State of Florida as to Karma of Palm Beach, Inc. on January 27, 2022, and a UCC-1 financing statement with the State of Florida as to Karma of Broward, Inc. on January 27, 2022 (collectively, "Financing Statements"). Copies of the Financing Statements, with the UCC-3 assignments

from Franklin Capital Group, LLC to Franklin Capital Funding, LLC, are attached

as **Exhibits D-F**, respectively.

31.     The Financing Statements identified the Collateral, as described

above, and included the following notice:

> UNDER AN AGREEMENT BETWEEN DEBTOR
> AND SECURED PARTY, DEBTOR HAS AGREED
> NOT TO SELL, ASSIGN, PLEDGE OR OTHERWISE
> ENCUMBER THE COLLATERAL DESCRIBED IN
> THIS FINANCING STATEMENT, WHICH
> INCLUDES ALL AFTER-ACQUIRED PROPERTY,
> INCLUDING ALL OF DEBTOR'S ACCOUNTS,
> FUTURE ACCOUNTS, CONTRACT RIGHTS,
> FUTURE SALES, RECEIPTS AND OTHER
> OBLIGATIONS. THE SALE, ASSIGNMENT,
> PLEDGE OR ENCUMBERING OF ANY SUCH
> COLLATERAL WOULD CONSTITUTE TORTIOUS
> INTERFERENCE WITH SECURED PARTY'S
> CONTRACTUAL RELATIONSHIP WITH DEBTOR.
> IN THE EVENT THAT ANY THIRD PARTY
> PURCHASES, TAKES AN ASSIGNMENT OR
> PLEDGE OF, AND/OR IS GRANTED A SECURITY
> INTEREST IN ANY OF THE ASSETS DESCRIBED IN
> THIS FINANCING STATEMENT, SECURED PARTY
> ASSETS A CLAIM TO ANY PROCEEDS THEREOF
> RECEIVED BY SUCH THIRD PARTY. DEBTOR HAS
> ALSO AGREED TO HOLD IN TRUST FOR
> SECURED PARTY ALL PAYMENTS RECEIVED IN
> CONNECTION WITH SECURED PARTY'S
> COLLATERAL, AND FROM THE SALE, LEASE OR
> OTHER DISPOSITION OF SUCH COLLATERAL.
> **ANY ATTEMPT BY A THIRD PARTY TO
> EXERCISE DOMINION OR CONTROL OVER
> THE COLLATERAL DESCRIBED IN THIS
> FINANCING STATEMENT WOULD**

## CONSTITUTE CONVERSION OF SECURED PARTY'S COLLATERAL.

*Id.* (emphasis in original and added).

32.     Thus, anyone exercising dominion or control over or otherwise interfering with Debtor's accounts or other assets after Franklin filed its UCC-1 Financing Statements was on record notice that such interference with Franklin's security interest rights would constitute tortious interference and/or conversion.

### *2.   Franklin's purchase of the other obligations of Excell and its affiliates.*

33.     Concurrently with the making of its loan to Excell, Franklin Capital Group, LLC purchased from Austin, and Austin sold and assigned to Franklin, the obligations of Debtor owing to Austin under an Assignment of Obligations and Merchant Documents agreement dated October 29, 2021 ("Assignment Agreement"). A copy of the Assignment Agreement is attached as **Exhibit G**.

34.     Franklin Capital Group, LLC assigned all of its right, title, and interest in the Assignment Agreement to Franklin Capital Funding, LLC.

35.     Under the Assignment Agreement, Austin assigned to Franklin all of its right, title, and interest under its agreements with Excell and its affiliates, "including any claims, rights or actions [Austin] may have (whether known or unknown to [Austin] as of the date hereof) against any third party arising in

11

connection with, or otherwise related to, [its agreements with Austin] or the Obligations [then owing to Austin]." *Id*. at p. 1, ¶ 2(a).

36.     In addition, Franklin and Austin agreed that Franklin could file UCC-3 assignments assigning from Austin to Franklin all UCC-1 financing statements that Austin had filed. *Id*. at p. 1, ¶ 2(b).

37.     Thereafter, Franklin filed all necessary UCC-3 assignments, and it then held the most senior perfected security interest in the assets of Debtor, including its accounts receivable. *See* **Exhibit H**.

38.     But it was not only Debtor's merchant cash advance obligations that Franklin purchased. Just as important to Franklin was Austin's agreement that it would no longer do business with Debtor and any other borrower of Franklin.

39.     As it relates to Debtor, this agreement was of utmost importance to Franklin to ensure repayment of Debtor's obligations to it and the financial drain that a merchant-cash-advance arrangement can have on a company.

40.     To that end, Austin agreed:

> **On and after the date of this Assignment, Assignor covenants to Assignee that, so long as Assignee has a UCC financing statement filed of record against any of the Credit Parties or any other person or entity, whether or not related to the Credit Parties (any such Credit Party, person or entity, a "Debtor") that includes language notifying parties that further sales, assignments, pledges or encumbrances with respect to the collateral described in Assignee's UCC financing**

12

**statement are prohibited, or words of similar import: (a) Assignor shall not purchase any portion of accounts, future accounts, contract rights, future sales, receipts or other obligations from such Debtor, (b) Assignor shall not extend credit to such Debtor, (c) Assignor shall not take a security interest in the assets of such Debtor**, and (d) if Assignor violates any of the provisions of clauses (a), (b), or (c) above, its debt and lien shall be subordinate and it shall be subject to a permanent standstill and it shall not take any legal action or otherwise exercise any rights or remedies against such Debtor. Assignor further covenants and agrees that it shall not accept any payment from any of the Credit Parties on account of, or related to, the Obligations …, and **Assignor acknowledges and agrees that any such payments, if received, shall be held in trust for the benefit of [Franklin] and promptly paid over to [Franklin] in the form received** (with proper endorsements or assignment if necessary). [*See* Exhibit G, p. 2, ¶ 6 (emphasis added).]

### 3. *Defendants seek to avoid their obligations under the Assignment Agreement and continue to take additional payments from Excell and its affiliates.*

41.    Prior to executing the Assignment Agreement, Austin (doing business under the assumed name of "GetBackd") had entered into a merchant cash advance agreement with Excell dated January 20, 2021. *See* **Exhibit I**.

42.    The merchant cash advance agreement was executed by Xan Myburgh as chief executive officer of Austin. *Id*., p. 4.

43.    Austin's rights under this merchant cash advance were assigned to Franklin under the Assignment Agreement and, as set forth above, Austin agreed

not to enter into further funding agreements with Debtor and any other borrower of Franklin where Franklin had filed a UCC financing statement.

44.     Franklin, however, has learned that, after executing the Assignment Agreement, Austin's subsidiary and alter ego, MXT, entered into another merchant cash advance agreement with Debtor dated November 29, 2021, under which Debtor was to make 52 payments each in the amount of $31,250.00. *See* **Exhibit J**.

45.     This merchant cash advance agreement also was executed by Mr. Myburgh, this time as a member of MXT. *Id*., p. 3.

46.     Thereafter, Austin and MXT, either directly or under the name GetBackd, took funds from Debtor.

47.     At least five debit transactions, totaling $157,000, were made from Debtor's Chase Bank accounts directly to Austin – not MXT – between December 2021 and March 2022. *See* **Exhibit K**, transaction summary spreadsheet; *see also* **Exhibit L**, account statements for account ending in -901; **Exhibit M**, account statement for account ending in -199; **Exhibit N**, account statements for account ending in -181.

48.     Another eight debit transactions (at least), totaling $250,000, were made from Debtor's Chase Bank accounts to GetBackd between December 2021 and April 2022. *See* Exhibit K; *see also* Exhibit L; **Exhibit O**, account statements for account ending in -711.

14

49.     Moreover, upon information and belief, after October 29, 2021, Austin and MXT transferred funds taken from Debtor between one another in an attempt to avoid the Assignment.

50.     Thus, despite assigning to Franklin all of the rights under its agreements with Debtor (*i.e.*, Excell and its affiliates), Austin and its subsidiary and alter ego, MXT, continued to pursue the purchase of the accounts, future accounts, contract rights, future sales, receipts or other obligations of Debtor and the extension of credit to Debtor.

51.     By using MXT to enter into a new merchant cash advance agreement with Debtor, Austin sought to avoid the provision in the Assignment Agreement prohibiting such activity.

52.     Austin and MXT conspired with Debtor to enter into a new funding agreement and to take funds—in the form of proceeds from accounts receivable—from Debtor without Franklin's consent or approval after executing the Assignment Agreement.

53.     There can be no doubt that MXT is the subsidiary of Austin and that they are alter egos.

54.     In addition to the fact that they both operate under the same trade name of Get Back'd and have transferred funds collected from Debtor between themselves, discovery has shown that they are basically the same entity.

55.     Indeed, discovery in these proceedings have shown this to be true.

56.     MXT's sole member is Austin. *See* **Exhibit P**, defendants' supplemental discovery responses, at interrogatory no. 1.

57.     Austin and MXT share the same office space. *Id*., interrogatory no. 7.

58.     MXT has no employees. Instead, Austin employees Mr. Myburg, Michail Myburgh, and Tucker Sulzberger act as agents for MXT for which they receive no direct compensation from MXT. *Id*., interrogatory nos. 3-5.

59.      Defendants have admitted that Mr. Myburg takes actions on behalf of both Austin and MXT and that he has signed agreements on behalf of both entities. *See* Exhibit Q, defendants' discovery responses, at requests for admission nos. 3, 6-7.

60.     Defendants also both use the same assumed name "Get Back'd".

61.     The funds that Austin and MXT obtained, debited, or sought to seize from the accounts of Debtor constituted or contained Franklin's Collateral, including identifiable cash proceeds from their accounts receivable in which Franklin held a higher priority security interest.

62.     Defendants were aware that Franklin held the most senior security interest in the accounts when they debited, obtained, or sought to seize funds from Debtor and were aware that their actions—directly or indirectly—breached their agreements with Franklin.

4857-4607-7749.v4

## COUNT I
## <u>BREACH OF CONTRACT</u>
## <u>(against Austin)</u>

63.     Franklin incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

64.     The Assignment Agreement is a valid contract between Franklin and Austin. *See* Exhibit G.

65.     Under the Assignment Agreement, Austin assigned all of its rights, including the right to payment, under its agreements with Debtor to Franklin. *Id*. at p. 1, ¶ 2(a).

66.     In addition, in executing the Assignment Agreement, Austin agreed that it would not enter into any further purchase agreements with Debtor or any other borrower of Franklin, would not extend any further credit to Debtor or any other borrower of Franklin, and would not take any further payments from Debtor and that, if it received any such payments, they would be paid promptly to Franklin. *Id*. at p. 2, ¶ 6.

67.     Austin breached its contract with Franklin when it—directly or through shell entities controlled by it, including MXT or GetBackd—continued to enter into purchase agreements or other funding agreements with Debtor and continued to debit funds or to attempt to obtain or seize funds from the accounts of Debtor and when it did not pay such funds to Franklin. *Id*. at p. 1, ¶ 2(a).

4857-4607-7749.v4

68.     In fact, Excell's Chase Bank account records show that Austin directly debited at least $157,000 from Excell after executing the Assignment Agreement on October 29, 2021.

69.     Austin's related entities or subsidiaries and alter egos debited at least an additional $250,000 from Debtor after October 29, 2021.

70.     Austin's aforementioned actions in breach of the Assignment Agreement have caused damages to Franklin.

71.     Franklin has suffered damages in the amount of the funds debited, obtained, or seized from Excell or its affiliates that constitute Franklin's Collateral, the consideration paid to Austin under the Assignment Agreement, and all related and consequential damages.

72.     Franklin has furthered suffered damages from Austin's breach of contract in that it did not receive the benefit of its bargain that Austin agreed that it would not enter into any further purchase agreements with Debtor or any other borrower of Franklin, would not extend any further credit to Debtor or any other borrower of Franklin, and would not take any further payments from Debtor in that it has not received the benefit of its bargain as is entitled to receive in damages all amounts it paid to Austin in consideration of the Assignment Agreement.

4857-4607-7749.v4

73.     Under the Assignment Agreement, Franklin also is entitled to recover its attorney fees in this action and to recover triple the amount of its actual/compensatory damages. *See* Exhibit G, ¶ 9.

WHEREFORE, Franklin requests that the Court enter a judgment in favor of Franklin and against Austin in an amount greater than $75,000, plus incidental and consequential damages, triple damages, costs, interest, and attorney fees, and award all other relief the Court deems appropriate.

## COUNT II
## TORTIOUS INTERFERENCE WITH AN EXISTING CONTRACTUAL RELATIONSHIP
## (against MXT)

74.     Franklin incorporates by reference the allegations in the foregoing paragraphs as if set forth fully herein.

75.     Franklin had a valid contractual relationship with Austin through the Assignment Agreement.

76.     Austin breached its contract with Franklin, as set forth in prior allegations.

77.     MXT instigated Austin's breach of contract without justification.

78.     MXT had actual or constructive knowledge of Franklin's contractual relationship with Debtor because its parent company and alter ego, Austin, had

19

entered into an Assignment Agreement in which it assigned its right to any payment from Excell to Franklin.

79.   MXT intentionally and wrongfully interfered with Franklin's contractual relationship with Austin when, among other potential aggressive tactics, it entered into a new merchant cash advance agreement with Excell/Debtor and when it debited, obtained, or seized the accounts of Debtor or asserted dominion over them, which constitute and contain Franklin's Collateral and converted proceeds.

80.   MXT's actions have caused a breach or termination of Franklin's contractual relationship with Austin because MXT has debited, obtained, or seized Collateral and/or converted proceeds that rightfully belong to Franklin as the purchaser of those assets under the Assignment Agreement and as the senior lienholder under the UCC.

81.   MXT's actions constituted the intentional doing of a *per se* wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading Franklin's contractual relationship.

82.   Franklin has been damaged as a result of MXT's actions because it has taken Collateral and/or converted proceeds that rightfully belong to Franklin, which Franklin has been unable to recover.

4857-4607-7749.v4

WHEREFORE, Franklin requests that the Court enter a judgment in favor of Franklin and against MXT in an amount greater than $75,000, plus incidental and consequential damages, costs, interest, and attorney fees, and award all other relief the Court deems appropriate.

### COUNT III
### TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY
### (against MXT)

83.    Franklin incorporates by reference the allegations in the foregoing paragraphs as if set forth fully herein.

84.    Franklin had a valid business relationship or expectancy with Austin and with Debtor.

85.    Franklin extended a loan to Excell, which was governed by the parties' loan documents.

86.    As security for its loan from Franklin, Debtor granted Franklin a security interest in the Collateral.

87.    Franklin perfected its security interest by filing the Financing Statements.

88.    Franklin concurrently purchased the obligations of Debtor to Austin and obtained an assignment of its security interests in the Collateral.

89.    Franklin then held the most senior perfected security interest in the Collateral.

90.     MXT had actual or constructive knowledge of Franklin's relationship or expectancy with Debtor and with Austin because of the UCC financing statements on record.

91.     MXT further had actual or constructive knowledge of Franklin's relationship or expectancy under the Assignment Agreement with Austin because the Assignment Agreement was between Franklin and MXT's parent company and alter ego, Austin.

92.     MXT intentionally and wrongfully interfered with Franklin's relationship or expectancy with Excell and its affiliates and Austin when, among other potential aggressive tactics, it debited, obtained, or seized the accounts of Excell or its affiliates or threatened to seize such accounts, which constitute and contain Franklin's Collateral and converted proceeds.

93.     MXT's actions have induced or caused a breach or termination of Franklin's relationship or expectancy with Excell and its affiliates and with Austin because MXT has attempted to seize or has debited or obtained Collateral and/or converted proceeds that rightfully belong to Franklin as the purchaser of those assets under the Assignment Agreement and as the senior lienholder under the UCC.

94.     MXT's actions were illegal, unethical, or fraudulent.

95.    Franklin has been damaged as a result of MXT's actions because it has taken Collateral and/or converted proceeds that rightfully belong to Franklin, which Franklin has been unable to recover.

96.    Franklin fears that defendants will completely consume Franklin's Collateral, leaving Franklin with a virtually unsecured loan.

WHEREFORE, Franklin requests that the Court enter a judgment in favor of Franklin and against MXT in an amount greater than $75,000, plus incidental and consequential damages, costs, interest, and attorney fees, and award all other relief the Court deems appropriate.

**COUNT IV**
**COMMON LAW CONVERSION**
**(against all defendants)**

97.    Franklin incorporates by reference the allegations in the foregoing paragraphs as if set forth fully herein.

98.    Defendants had actual or constructive knowledge that Franklin, as assignee, was the senior secured creditor as to the accounts of Debtor.

99.    Despite that knowledge, defendants retained, converted, stole, and or/embezzled Franklin's Collateral for their own use when they debited, obtained, or seized the accounts of Excell or its affiliates, which constitute and contain Franklin's Collateral, thereby interfering with Franklin's rights as the senior secured creditor.

4857-4607-7749.v4

100.   Defendants, therefore, wrongfully exerted domain over Franklin's property in denial of or inconsistent with Franklin's rights therein.

101.   Franklin had the right to its Collateral when defendants took the aforementioned actions.

102.   Franklin has been damaged as a result of defendants' actions because they have taken Collateral that rightfully belongs to Franklin, which Franklin has been unable to recover.

103.   In other words, defendants' actions are interfering with Franklin's rights as a senior creditor under the UCC.

104.   Defendants' actions constitute common law conversion.

105.   Franklin is entitled to treble damages as a result of defendants' conversion.

106.   Franklin also fears that defendants will completely consume Franklin's Collateral leaving Franklin with a virtually unsecured loan.

107.   In that event, Franklin will suffer irreparable harm and will have no adequate remedy at law.

WHEREFORE, Franklin requests that the Court enter a judgment in favor of Franklin and against defendants, jointly and severally, in an amount greater than $75,000, plus incidental, consequential, and treble damages, costs, interest, and attorney fees, and award all other relief the Court deems appropriate.

4857-4607-7749.v4

## COUNT V
## <u>STATUTORY CONVERSION</u>
### <u>(against all defendants)</u>

108.   Franklin incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

109.   Defendants had actual or constructive knowledge that Franklin, as assignee, was the senior secured creditor as to the accounts of Debtor.

110.   Despite that knowledge, defendants retained, converted, stole, and or/embezzled Franklin's Collateral for their own use when they debited, obtained, or seized the accounts of Debtor, which constitute and contain Franklin's Collateral, thereby interfering with Franklin's rights as the senior secured creditor.

111.   Defendants, therefore, wrongfully exerted domain over Franklin's property in denial of or inconsistent with Franklin's rights therein.

112.   Franklin had the right to its Collateral when defendants took the aforementioned actions.

113.   Franklin has been damaged as a result of defendants' actions because they have taken Collateral that rightfully belongs to Franklin, which Franklin has been unable to recover.

114.   In other words, defendants' actions are interfering with Franklin's rights as a senior creditor under the UCC.

4857-4607-7749.v4

115.  Defendants' actions constitute statutory conversion under MCL 600.2919a.

116.  Franklin is entitled to treble damages as a result of defendants' conversion.

117.  Franklin also fears that defendants will completely consume Franklin's Collateral leaving Franklin with a virtually unsecured loan.

118.  In that event, Franklin will suffer irreparable harm and will have no adequate remedy at law.

WHEREFORE, Franklin requests that the Court enter a judgment in favor of Franklin and against defendants, jointly and severally, in an amount greater than $75,000, plus incidental, consequential, and treble damages, costs, interest, and attorney fees, and award all other relief the Court deems appropriate.

Respectfully submitted,

BODMAN PLC

By:  /s/ Melissa Benton Moore (P73018)
     J. Adam Behrendt (P58607)
     Melissa Benton Moore (P73018)
201 West Big Beaver, Suite 500
Troy, Michigan 48084
(248) 743-6000

December 12, 2022            Attorneys for Plaintiff

26

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2022, I electronically filed the foregoing papers with the Clerk using the ECF-filing system, which will send notification of such filing and e-serve the document upon all attorneys of record.

/s/ Melissa Benton Moore (P73018)

Dated:       December 12, 2022

4857-4607-7749.v4