UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANKLIN CAPITAL FUNDING, LLC,

                          Plaintiff,                            Case Number 22-10947

v.                                                          Honorable David M. Lawson

AUSTIN BUSINESS FINANCE, LLC, and
MXT SOLUTIONS, LLC,

                          Defendants.

_____/

## <u>OPINION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS</u>

Plaintiff Franklin Capital Funding, LLC loaned money to a Florida automobile dealer (Excell Auto Group) and took a security interest in all its assets. Franklin also purchased Excell's factoring debt from defendant Austin Business Finance, LLC under an agreement in which Austin agreed not to extend any more credit to Excell, to factor any more of Excell's receivables, or to accept any payments from Excell. In its amended complaint, Franklin alleges that Austin breached all these promises by employing defendant MXT Solutions, LLC as its *alter ego* to extend more credit to Excell and to receive payments from it that should have gone to Franklin. Austin has filed a motion to dismiss the amended complaint, arguing that it fails to state any viable claims against it. MXT has moved to dismiss on the ground that the Court does not have personal jurisdiction over it. The motions are fully briefed, and oral argument will not assist in their resolution. The Court will decide the motions on the papers submitted. E.D. Mich. LR 7.1(f)(2). The amended complaint states facts that establish Austin's liability to Franklin both directly and through its alleged *alter ego*, MXT. And because the amended complaint sufficiently alleges that MXT was Austin's *alter ego*, and Austin consented to personal jurisdiction in this Court, Franklin may proceed against MXT here. The motions to dismiss will be denied.

I.

The facts are taken from the amended complaint.  Plaintiff Franklin is a private company that makes and services small business loans.  In addition to making principal loans to customers, Franklin purchases its customers' existing financing obligations owed to other creditors in order to consolidate customers' loans.  Defendants Austin and MXT are merchant cash advance funding (factoring) companies.  They buy companies' accounts receivables at discounted cash purchase prices then regularly debit those companies' bank accounts until the purchase price is repaid.

The dispute in this case involves non-party Excell Automotive Group, a Florida corporation, and its Florida-based affiliates, Karma of Palm Beach and Karma of Broward.  In November 2021, Excell obtained a $6 million loan from Franklin.  The terms of the loan agreement granted Franklin a security interest in all of Excell's personal property and the property of its affiliates, including all accounts receivable, deposit accounts, and property "now or later in possession of the Lender, or as to which Lender now or later controls possession by documents or otherwise."  Am. Compl., ECF No. 45, ¶¶ 22, 28, PageID.1103-05; Continuing Security Agreement, ¶ 2, ECF No. 45-4, PageID.1157-58.  To perfect its security interest, Franklin filed a UCC-1 financing statement in the State of Florida.  The financing statement described Excell's collateral as "all after-acquired property, including all of debtor's accounts, future accounts, contract rights, future sales, receipts and other obligations," and warned that Excell "has also agreed to hold in trust for secured party all payments received in connection with secured party's collateral, and from the sale, lease or other disposition of such collateral."  Am. Compl., ¶ 30, ECF No. 45, PageID.1106; Excell Financing Statement, ECF No. 45-5, PageID.1176-78.  Franklin also filed UCC-1 financing statements for Excell's affiliates.

At the same time that Franklin made the loan to Excell, it also purchased Excell's

outstanding financial obligations to defendant Austin, which arose from a January 2021 funding

agreement that Austin had made with Excell while doing business under the name "GetBackd."

As part of the assignment of its interests to Franklin, Austin promised not to enter into any further

funding agreements or otherwise do business with Excell.  The assignment agreement states:

> On and after the date of this Assignment, Assignor [Austin] covenants to Assignee
> [Franklin] that, so long as Assignee has a UCC financing statement filed of record
> against any of the Companies [Excell and its affiliates] . . . that includes language
> notifying parties that further sales, assignments, pledges or encumbrances with
> respect to the collateral described in Assignee's UCC financing statement are
> prohibited, or words of similar import:  (a) Assignor shall not purchase any portion
> of accounts, future accounts, contract rights, future sales, receipts or other
> obligations from such Debtor, (b) Assignor shall not extend credit to such Debtor,
> (c) Assignor shall not take a security interest in the assets of such Debtor, and (d)
> if Assignor violates any of the provisions of clauses (a), (b), or (c) above, its debt
> and lien shall be subordinate and it shall be subject to a permanent standstill and it
> shall not take any legal action or otherwise exercise any rights or remedies against
> such Debtor.  Assignor further covenants and agrees that it shall not accept any
> payments from any of the Companies on account of, or related to, the Obligations
> . . . and Assignor acknowledges and agrees that any such payments, if received,
> shall be held in trust for the benefit of Assignee and promptly paid over to Assignee
> in the form received . . . .

Assignment Agreement, ¶ 6, ECF No. 45-8, PageID.1198.  The assignment agreement elsewhere

describes "Obligations" as

> all outstanding obligations of Excell Auto Group, Inc. and each of its affiliates
> owing to Assignor [Austin] under that certain Future Receivables Sale Agreement,
> dates as of January 20, 2021, by and between Assignor and Company [Excell and
> its affiliates] and all rights of Assignor under any similar or related documents
> (including without limitation, any guaranties, security agreements, forbearance
> agreements, settlement agreements and judgments), including with respect to all
> collateral securing the obligations of Company under the Merchant Agreement or
> securing any guaranties in respect thereof.

*Id.* at PageID.1197.

Although the assignment agreement repeatedly references Excell's affiliates, it only

references Austin's affiliates once, in a preceding paragraph, in which Austin "represents and

warrants" that "Assignor (including any of its affiliates) has not entered into any written or oral agreement with Company relating to this Assignment." *Id.* at ¶ 4, PageID.1197.  Austin consented that "any dispute, controversy or claim (whether or not arising out of or in connection with this Assignment) between Assignor and Assignee shall be governed by and construed in accordance with the laws of the State of Michigan." *Id.* at ¶ 8, PageID.1198.  Austin further submitted "to the non-exclusive jurisdiction and venue of the federal court located in the Eastern District of Michigan or the state courts located in Oakland County, Michigan." *Ibid.*  Franklin filed UCC-3 financing statements to perfect the assignment.

On November 29, 2021, defendant MXT entered into a merchant cash advance agreement with Excell, through which MXT purchased Excell's "future accounts and contract rights arising from the sale of goods or rendition of services to [Excell's] customers." *Id.* at ¶ 44, PageID.1111; MXT Future Receivables Sale Agreement, ¶ 1.1, ECF No. 45-11, PageID.1229.  Excell agreed to remit future receivables to MXT "by receiving Customer payments into a designated bank account approved by" MXT, which then would be debited by MXT. *Id.* at ¶ 1.2.  The agreement obligated Excell to make 52 such payments to MXT of $31,250 each.  Excell, however, made at least five debit transactions directly to Austin, not MXT.  Excell's bank records indicate that Austin debited payments totaling $157,000 from Excell's Chase Bank accounts between December 2021 and March 2022.  Excell also made at least eight debit transactions directly to GetBackd, totaling $250,000.  And after debiting funds from Excell's accounts, Austin and MXT transferred those funds to one another.  Franklin alleges that Austin and MXT conspired with Excell to enter into a new funding agreement and take the proceeds from accounts receivable from Excell, which constituted Franklin's collateral.  It further alleges that Austin, directly or through MXT and GetBackd, debited funds from Excell that Excell should have paid to Franklin.

In its amended complaint, Franklin contends that MXT is a subsidiary and *alter ego* of Austin, and that Austin used MXT to enter into a new merchant cash advance agreement with Excell to avoid the Assignment Agreement with Franklin.  To back that up, Franklin alleges that Austin is the sole member of MXT; that MXT has no employees; and that MXT relies upon Austin employees Xan Myburgh, Michail Myburgh, and Tucker Sulzberg to act as uncompensated agents on its behalf.  It also states that both Austin's and MXT's cash advance agreements with Excell were executed by Xan Myburgh, who is CEO of Austin and a member of MXT.  Finally, the complaint alleges that Austin and MXT both operate under the trade name GetBackd and share the same office space.  The defendants acknowledge that they share an office, but they explain that they each pay their proportionate share of expenses and maintain separate books, records, and bank accounts.

The record includes unsworn declarations from MXT corporate counsel Christopher Mundt.  In the declarations, Mundt states that MXT does not have any clients in Michigan, does not target any advertising to Michigan, does not own any real property in Michigan, does not have any bank accounts in Michigan, has no contracts with Michigan residents, and never has solicited business in Michigan.  He says that MXT was formed for the purpose of funding financing agreements and that its operations are funded by third-party investors unrelated to Austin.  And he maintains that MXT maintains its own independent financial statement and does not share or have access to Austin's bank accounts.  However, Mundt also acknowledges that Austin services MXT's financing agreements and receives payment from MXT under a service agreement.  He further admitted that Excell made wire transfers to Austin that in fact were owed and credited to MXT.  Mundt surmises that Excell made the payments to Austin as MXT's servicer because it believed that the payments complied with MXT's cash-advance contract.

The record also includes text messages and emails that Franklin attached to its response to MXT's motion to dismiss for want of personal jurisdiction.  On November 19, 2021, "Scott" received text messages from "Noah" indicating that Noah had spoken to GetBackd about "2 million" in "Real money cheap money not diverse type bs money because it's a renewal and there's trust."  Nov. 19, 2021 Texts, ECF No. 53-3, PageID.1457.  On November 26, 2021, Noah texted Scott to state that he "just got off the phone with zahn and Tucker and the deal stands at 1 million. This is a solid deal!  No ucc, funded into a different bank account 20% in 90 days and 30% over 12 months."  Nov. 26, 2021 Texts, ECF No. 53-4, PageID.1459.  Finally, on November 29, 2021, Tucker Sulzberger sent Scott Zankl an email with the subject line "MXT Solutions."

> Scott, on behalf of MXT Solutions, there will be no UCC filed unless there is a default.  A default is defined as taking another receivable type advance (non bank rates) or missed payment.  Additionally, if the EPA is not executed, we reserve the right to request bank statements to verify the above is satisfied.  If not provided, we will be forced to file a UCC.  Shorter term advances will put a strain on your bank account that may cause NSFs.

Nov. 29, 2021 Email, ECF No. 53-5, PageID.1461.  Sulzberger sent the message from his getbackd.com account to Zankl's excellauto.com account.  Mundt submitted a third unsworn declaration stating that Austin has never employed anyone named "Noah" or "Scott."

The defendant filed motions to dismiss earlier in the case directed to the original complaint. The Court denied those motions and allowed the plaintiff to file an amended complaint.  On December 12, 2022, Franklin Capital Funding (the successor to the original plaintiff in this case) filed an amended complaint pleading claims of (1) breach of contract against Austin; (2) tortious interference against MXT for instigating Austin's breach; (3) tortious interference against MXT for interfering with Franklin's business expectancy with Excell; (4) common law conversion against Austin and MXT; and (5) statutory conversion against Austin and MXT.  In the amended complaint, Franklin alleges that it has suffered damages in the amount of payments made or funds

debited, obtained, or seized from Excell from accounts that constitute Franklin's collateral; the consideration it paid to Austin under the assignment agreement; and all related and consequential damages. The defendants responded with the present motions to dismiss.

<div align="center">II.</div>

In its motion to dismiss, defendant Austin argues that Franklin has not pleaded a viable claim against it for breach of contract because it was not a party to the contract between MXT and Excell, and its assignment agreement with Franklin merely barred it from purchasing Excell's financial assets, extending Excell credit, or taking a security interest in Excell's assets, which it is not accused of doing. Austin also argues that Franklin failed plausibly to plead its conversion claims because the amended complaint does not plead facts sufficient to support a conclusion that the $407,000 Excell paid to MXT was Franklin's property or that the assignment agreement prevented Excell from using its resources to pay other debts.

The purpose of a motion to dismiss based on Federal Rule of Civil Procedure 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the factual allegations in the complaint are taken as true. *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). The complaint is viewed in the light most favorable to the plaintiff, the factual allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). To survive the motion, the plaintiff "must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.'" *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)). Unsupported conclusions will not suffice. "Plausibility requires showing more than the 'sheer possibility' of

<div align="center">- 7 -</div>

relief but less than a 'probab[le]' entitlement to relief." *Ibid.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

When deciding a motion under Rule 12(b)(6), the Court looks only to the pleadings. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). But the Court also may consider the documents attached to them, *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)), documents referenced in the pleadings that are "integral to the claims," *id.* at 335-36, documents that are not mentioned specifically but which govern the plaintiff's rights and are necessarily incorporated by reference, *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002), and matters of public record, *Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010). However, beyond that, assessment of the facial sufficiency of the complaint ordinarily must be undertaken without resort to matters outside the pleadings. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).

A.

On the breach of contract claims, it does not appear that Austin would dispute the proposition that, if it had engaged in the same course of conduct that is alleged against MXT, a material breach of the agreements would be pleaded easily. Austin insists, though, that MXT's conduct cannot be attributable to it as MXT's *alter ego* because Franklin has not alleged facts sufficient to pierce the corporate veil, and Michigan law does not permit piercing the veil to create a breach.

The Court disagrees. The amended complaint pleads sufficient facts to state a claim for breach of contract based on Austin's own actions, and the pleading also contains sufficient factual matter to establish Austin's liability on an *alter ego* theory.

- 8 -

1.

First, the amended complaint plausibly pleads that Austin directly took actions in breach of its assignment agreement with Franklin. To state a claim for breach of contract under Michigan law, a plaintiff first must establish the elements of a valid contract. *Pawlak v. Redox Corp.*, 182 Mich. App. 758, 765, 453 N.W.2d 304, 307 (1990). A valid contract is formed when there are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Thomas v. Leja*, 187 Mich. App. 418, 422, 468 N.W.2d 58, 60 (1991). Once a valid contract has been established, the plaintiff then must prove (1) the terms of the contract, (2) breach of those terms by the defendant, and (3) injury to the plaintiff resulting from the breach. *Lossia v. Flagstar Bancorp Inc.*, 895 F.3d 423, 428 (6th Cir. 2018) (citing *Miller-Davis Co. v. Ahrens Const., Inc.*, 296 Mich. App. 56, 71, 817 N.W.2d 609, 619 (2012)).

The parties do not dispute that a contract — the assignment agreement — existed between them. They also do not dispute that the assignment prohibited Austin from (1) purchasing any portion of Excell's accounts or sales, (2) extending credit to Excell, (3) taking a security interest in Excell's assets, or (4) accepting payment from Excell "on account of, or related to, the Obligations." Assignment Agreement, ¶ 6, ECF No. 45-8, PageID.1198. Franklin alleges in its amended complaint that Austin breached its contractual duties by debiting funds from Excell and accepting payments from Excell under the company's contract with MXT. It further alleges that it suffered damages because Austin obtained funds from Excell's accounts that constituted Franklin's collateral, that such funds should have been paid to Franklin, and that Franklin did not receive the benefit of its bargain that Austin would not take further payments from Excell. Those allegations are sufficient under Michigan law to state a valid claim for breach of contract.

Austin maintains that the plain terms of the assignment agreement do not bar it from acting as a servicer for or receiving the proceeds from Excell's other contracts, including Excell's contract with MXT. Contending that the assignment agreement defines "obligations" only as those outstanding on the date of the assignment, Austin also maintains that it is not prohibited from receiving the proceeds from future obligations owed by Excell. The assignment agreement does not support Austin's narrow reading. The assignment plainly defines "obligations" to include "all" of Austin's rights under "*any* similar or related documents" to the assignment agreement, including "*any* guaranties, security agreements, forbearance agreements, settlement agreements and judgments." Assignment Agreement, ECF No. 45-8, PageID.1197 (emphasis added). And even to the extent that the obligation language is ambiguous, at the motion to dismiss stage the Court must resolve all ambiguities in the contract in the plaintiff's favor. *Ajuba Int'l, L.L.C. v. Saharia*, 871 F. Supp. 2d 671, 689 (E.D. Mich. 2012). "In other words, '[t]he construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim.'" *Ibid.* (quoting *Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992)); *see also Ram Int'l, Inc. v. ADT Sec. Servs., Inc.*, 555 F. App'x 493, 503 (6th Cir. 2014) (affirming denial of motion to dismiss where contract language was ambiguous); *Klapp v. United Ins. Grp. Agency, Inc.*, 468 Mich. 459, 469, 663 N.W.2d 447, 453-54 (2003) ("It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury.").

Franklin has stated a viable cause of action for breach of contract in its amended complaint.

2.

In addition, the amended complaint plausibly pleads that Austin used MXT to breach its assignment with Franklin.

Under Michigan law, separate business structures are not "fictions"; instead, there is a presumption that the corporate form will be respected. *Seasword v. Hilti*, 449 Mich. 542, 547, 537 N.W.2d 221, 224 (1995) (citing *Herman v. Mobile Homes Corp.*, 317 Mich. 233, 243, 26 N.W.2d 757, 761 (1947)). "This presumption, often referred to as a 'corporate veil,' may be pierced only when an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some overriding public policy.'" *Ibid.* (alteration in original) (quoting *Wells v. Firestone*, 421 Mich. 641, 650, 364 N.W.2d 670, 674 (1984)); *see also Paul v. Univ. Motor Sales Co.*, 283 Mich. 587, 602, 278 N.W. 714, 720 (1938) ("[W]hen the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.").

A plaintiff seeking to penetrate a corporate structure and access individual shareholders' assets must plead facts that show that (1) the corporate entity is a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss. *Nogueras v. Maisel & Assocs. of Mich.*, 142 Mich. App. 71, 86, 369 N.W.2d 492, 498 (1985); *Lyngaas v. Ag*, 992 F.3d 412, 420 (6th Cir. 2021).

Elaborating on these elements, the Michigan court of appeals explained that the trial court must first "determine whether the evidence establishes that the owner operated the entity as his or her alter ego — that is, as a sham or mere agent or instrumentality of his or her will." *Green v. Ziegelman*, 310 Mich. App. 436, 458, 873 N.W.2d 794, 807 (2015). It "then must determine whether the manner of use effected a fraud or wrong on the complainant." *Ibid.* (citing *Gledhill v. Fisher & Co.*, 272 Mich. 353, 358, 262 N.W. 371, 372 (1935)). "In considering this element, it is not necessary to prove that the owner caused the entity to directly harm the complainant; it is sufficient that the owner exercised his or her control over the entity in such a manner as to wrong

the complainant." *Ibid.* "But it bears repeating that establishing an entity for the purpose of avoiding personal responsibility is not by itself a wrong that would warrant disregarding the entity's separate existence." *Id.* at 458, 873 N.W.2d at 807 (citing *Gledhill*, 272 Mich. at 359-61, 262 N.W. at 373). "Finally, the trial court must determine whether the wrong would cause the complainant to suffer an unjust loss." *Ibid.* (citing *Gledhill*, 272 Mich. at 359, 262 N.W. at 373).

To show that one entity is the "mere instrumentality" of another entity, courts look to these factors:

> (1) whether the corporation is undercapitalized, (2) whether separate books are kept, (3) whether there are separate finances for the corporation, (4) whether the corporation is used for fraud or illegality, (5) whether corporate formalities have been followed, and (6) whether the corporation is a sham.

*Glenn v. TPI Petroleum, Inc.*, 305 Mich. App. 698, 716, 854 N.W.2d 509, 520 (2014). However, "[t]he existence of one of these factors, alone, is not necessarily dispositive, nor are the listed factors exhaustive." *In re Flint Water Cases*, 584 F. Supp. 3d 383, 401 (E.D. Mich. 2022) (Levy, J.) (citing *Lyngaas*, 992 F.3d at 421). Rather, the Court should "examine the totality of the evidence surrounding the owner's use of an artificial entity and, in particular, the manner in which the entity was employed in the matter at issue." *Ibid.* (quoting *Green*, 310 Mich. App. at 458, 873 N.W.2d at 807).

a.

The amended complaint pleads sufficient facts to support an inference that MXT is an *alter ego* of Austin. It alleges that Austin and MXT share principal offices and functionally share staff, as MXT has no employees of its own but instead relies on Austin employees to act on MXT's behalf. Am. Compl., ¶¶ 57-58, ECF No. 45, PageID.1113. It further alleges that Austin employees are not compensated for acting as MXT's agents and that Austin's CEO, Xan Myburgh, signed both Austin's and MXT's cash-advance contracts with Excell. *Id.* at ¶¶ 42, 45, 59, PageID.1110-

13.  The amended complaint states that Excell debited payments to Austin that were owed to MXT and that Austin and MXT transferred Excell's funds between one another.  *Id.* at ¶¶ 46-49, PageID.1111-12.  And it states that both MXT and Austin do business under the name "GetBackd" (or "Get Back'd").  *Id.* at ¶¶ 54, 60, PageID.1112-13.

Austin points to other facts in the record that suggest that MXT is not its *alter ego*, including that MXT and Austin are capitalized independently; maintain separate bank accounts, books, and records; and do not formally share employees or officers.  However, those facts do not appear in the amended complaint or any other permissible source of information when considering a motion under Rule 12(b)(6).  Moreover, no one factor is dispositive.  *See Green*, 310 Mich. App. at 457, 873 N.W.2d at 807 ("[T]here is no mechanical test for determining when the existence of a separate entity must be disregarded"; rather, "whether to disregard the separate existence of an entity depends on the totality of circumstances."); *Lyngaas*, 992 F.3d at 421 (weighing one factor against five others).  In addition, MXT does not formally share employees or officers with Austin only because it has none; it appears to rely on Austin's officers to run all of its business and does not compensate them for acting as its agents.  *See Bodenhamer Bldg. Corp. v. Architectural Rsch. Corp.*, 873 F.2d 109, 112 (6th Cir. 1989) (finding *alter ego* liability where the CEO of one firm "ran all of the businesses" for the other).  The amended complaint also alleges that the two companies "operate[] at the same location, . . . work[] in the same industry and interchange[] services at times."  *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 849 (6th Cir. 2017) (citing *Flynn v. Greg Anthony Constr. Co.*, 95 F. App'x 726, 737 (6th Cir. 2003)).  Taken as true, these facts are sufficient at the pleading stage to plausibly state that MXT is a mere instrumentality of Austin and the two entities "were a single entitle for purposes of liability for breach of contract."  *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 799 (6th Cir. 2007); *see also Novo*

*Nordisk A/S v. Caraco Pharm. Lab'ys, Ltd.*, 450 F. Supp. 2d 757, 761 (E.D. Mich. 2006) (finding that whether an "alleged controlling parent-subsidiary relationship exists in actuality is a matter better left up to the discovery process.").

<div align="center">b.</div>

The amended complaint also plausibly pleads that Austin used MXT in a manner to effectuate a fraud or wrong.  It alleges that Austin used MXT to avoid its assignment agreement with Franklin and enter into purchase or funding agreements with Excell.  A breach of contract can satisfy the "fraud or wrong" element for piercing the corporate veil under Michigan law.  *Servo*, 475 F.3d at 799-800 (citing *Herman*, 317 Mich. at 246, 26 N.W.2d at 762).

In "the traditional lawsuit in which a party seeks to pierce the corporate veil," the plaintiff attempts "to hold liable defendant's individual corporate executives or shareholders."  *Dutton Partners, LLC v. CMS Energy Corp.*, 290 Mich. App. 635, 643, n.4, 802 N.W.2d 717, 722 (2010) (citing *Rymal v. Baergen*, 262 Mich. App. 274, 293, 686 N.W.2d 241 (2004)).  Thus, in the contractual context, Michigan courts have been willing to consider whether "the corporate entity should be disregarded and the parent company held liable on the contracts of its subsidiary because the latter served as a mere instrumentality or adjunct of the former," depending on the "underlying facts" of each case.  *Herman*, 317 Mich. at 247, 26 N.W.2d at 763.  Austin argues that Franklin is trying to do the reverse:  having contracted with Austin, analogously the corporate parent, it seeks to reach down through the corporate structure; hold Austin liable for the actions of its affiliated company, MXT; and construe MXT's actions as Austin's breach.

Austin therefore argues that Franklin is attempting to turn the theory of *alter ego* liability on its head, maintaining that "alter ego . . . cannot be used to attribute one company's conduct to the other for purpose of establishing a breach of contract."  Reply, ECF No. 55, PageID.1593.  But

<div align="center">- 14 -</div>

it cites no controlling authority in support of that proposition, referencing only an unpublished Michigan court of appeals decision that considered whether the contractual relationship between two entities was a sufficient basis for treating one as the *alter ego* of another.  *See Botsford Gen. Hosp. v. United Am. Healthcare Corp.*, No. 241108, 2003 WL 22850448, at *2 (Mich. Ct. App. Dec. 2, 2003).  Here in contrast, the contractual relationship as described in the amended complaint is between the plaintiff and a defendant, and the plaintiff alleges that the defendant used its *alter ego* as its tool to commit a breach.  That is a viable theory.

Numerous courts have applied an *alter ego* liability theory to find a breach of contract.  In *Servo*, for example, the Sixth Circuit found that a corporate parent could be held liable for its subsidiary's breach, even though the plaintiff contracted only with the subsidiary.  *Servo*, 475 F.3d at 800.  The Michigan Supreme Court reached the same conclusion in *Herman*, holding a parent company responsible for subsidiaries' "contractual obligations to plaintiffs."  *Herman*, 317 Mich. at 247, 26 N.W.2d at 763.  Plainly, in an appropriate case, one company's conduct may be attributed to another for the purposes of establishing breach.

"The propriety of piercing the corporate veil is highly dependent on the equities of the situation, and the inquiry tends to be intensively fact-driven."  *Servo*, 475 F.3d at 798 (6th Cir. 2007) (citing *Kline v. Kline*, 104 Mich. App. 700, 305 N.W.2d 297, 299 (1981) (per curiam), and *Herman*, 26 N.W.2d at 761, 317 Mich. at 242).  The Michigan Supreme Court, therefore, has warned against applying the *alter ego* test in a "mechanistic fashion," holding that the "entire spectrum of relevant fact forms the background for such an inquiry, and the facts are to be assessed in light of the corporation's economic justification to determine if the corporate form has been abused."  *Klager v. Robert Meyer Co.*, 415 Mich. 402, 411-12, 329 N.W.2d 721, 725 (1982) (citing *Brown Bros. Equipment Co. v. State Highway Comm.*, 51 Mich. App. 448, 215 N.W.2d 591

(1974)).  Here, Franklin plainly pleaded that Austin received the benefits of MXT's contract with

Excell despite being prohibited by the terms of the assignment agreement from entering its own

contract with Excell.  Franklin further alleges that Austin knowingly used MXT to avoid the

assignment and take funds from Excell that should have been paid to Franklin.  Taken as true, that

is "an injurious fraud or wrong," and "piercing the corporate veil is proper."  *Servo*, 475 F.3d at

800.

<div style="text-align:center">c.</div>

Finally, the amended complaint plausibly pleads that Franklin would suffer an unjust loss

or injury unless the Court disregards the existence of MXT as separate from its owner.  The

amended complaint alleges that Austin used MXT to obtain funds from Excell that should have

been paid to Franklin, in violation of its assignment agreement with Franklin.  Am. Compl., ¶ 67,

ECF No. 45, PageID.1114.  Losses suffered from a breach of contract are "sufficient to constitute

an unjust loss for the purpose of veil-piercing liability."  *Servo*, 475 F.3d at 798.

Austin's motion to dismiss Count I of the amended complaint will be denied.

<div style="text-align:center">B.</div>

Austin also argues that Franklin's conversion claims fall short because the amended

complaint does not plead facts sufficient to support a conclusion that the $407,000 Excell paid to

MXT was Franklin's property or that the assignment agreement prevented Excell from using its

resources to pay other debts.  Maintaining that Franklin only held a security interest in Excell's

cash and accounts, not an ownership or possessory interest, Austin argues that Franklin cannot

state a claim for conversion unless it first foreclosed on its collateral.  It also argues that Franklin

did not allege that it properly perfected its security interest in Excell's deposit accounts.  And

because Excell still owned the money it paid to MXT at the time it made the payment, Austin says

<div style="text-align:center">- 16 -</div>

there can be no claim for the conversion of money where Excell consented via contract to create a debtor-creditor relationship with, and pay said money to, MXT.

Conversion arises from "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip, Inc. v. Columbian Distribution Servs., Inc.*, 497 Mich. 337, 351-52, 871 N.W.2d 136, 144 (2015) (quoting *Nelson & Witt v. Texas Co.*, 256 Mich. 65, 70, 239 N.W. 289, 291 (1931)). Under Michigan law, common-law conversion encompasses "any conduct inconsistent with the owner's property rights." *Ibid*.

In addition to a cause of action under common law, Michigan has two forms of statutory conversion, authorizing treble damages where a person is damaged as a result of:

> (a) Another person's stealing or embezzling property or converting property to the other person's own use.

> (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

Mich. Comp. Laws § 600.2919a. The statute adds the requirement that the conversion be to the other person's "own use." *Aroma Wines*, 497 Mich. at 354-57, 871 N.W.2d at 145-47. To satisfy that element, a plaintiff must demonstrate that "the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Id*. at 359, 871 N.W.2d at 148.

Franklin's claims for conversion against Austin appear to be based on Austin receiving at least 13 of the $31,250 payments Excell owed to MXT. Austin contends that receiving the payments cannot constitute conversion as a matter of law, because Excell owned the money used

to make the payment, and Franklin established neither an ownership interest nor a perfected security interest over Excell's cash and deposit accounts.

The parties dispute the extent to which a secured creditor may maintain an action for conversion. As a general matter, "a claim of conversion is clearly recognized under the Michigan Uniform Commercial Code . . . in an instance of unauthorized disposition of collateral." *Comerica Bank v. Suburban Tr. & Sav. Bank*, 99 F.3d 1138, 1996 WL 585888 at *4 (6th Cir. 1996) (table). The code specifies that, because "a security interest survives disposition of the collateral" in such cases, "the secured party may repossess the collateral from the transferee or, in an appropriate case, maintain an action for conversion." Mich. Comp. Laws § 440.9315 cmt. 2. The relevant prerequisite is that the creditor have a properly perfected security in interest in the collateral at issue. *See, e.g.*, *Comerica Bank*, 1996 WL 585888 at *6 (finding that because Comerica's "security interest could not be perfected," it "did not have a perfected security interest . . . for purposes of asserting a claim of conversion."); *Bank One, N.A. v. Cullen*, No. 04-72118, 2005 WL 3465722, at *6 (E.D. Mich. Dec. 19, 2005) ("A creditor with a properly perfected security interest in an account has an action for conversion where the payments on those accounts are diverted elsewhere."). Therefore, "[i]f the defendant's rights to the property are superior to the plaintiff's rights or the defendant's actions are otherwise authorized given the interests of both parties, the defendant's actions will be deemed privileged and the plaintiff will not be able to recover for conversion." *Stone Computer, Inc. v. UAW-Chrysler Nat. Training Ctr.*, No. 286864, 2010 WL 1872922, at *5 (Mich. Ct. App. May 11, 2010) (collecting cases).

But Franklin insists that it maintained a properly perfected security interest in Excell's collateral. At the heart of their dispute is a disagreement about the nature of the collateral secured. Austin maintains that Franklin has not met the requirements of Michigan Compiled Laws §

440.9312 for perfecting a security interest in a deposit account.  Under subsection (b)(1) of section 9-312, "the only method of perfecting a security interest in a deposit account as original collateral is by control."  Mich. Comp. Laws § 440.9312 cmt. 5.  Thus, Austin contends that the only way for Franklin to assert a conversion claim is first to foreclose on Excell's deposit accounts.  Franklin contends, however, that Excell put forward all of its property as collateral, and that section 9-315, which covers security interests in proceeds from collateral, therefore governs.  Under that section, "if the security interest in the original collateral was perfected, a security interest in identifiable cash proceeds will remain perfected indefinitely, regardless of whether the security interest in the original collateral remains perfected."  Mich. Comp. Laws § 440.9315 cmt. 7.

Franklin has the better argument.  Nothing on the face of the amended complaint suggests that the proceeds Austin allegedly converted came exclusively from Excell's deposit accounts.  To the contrary, the complaint clearly alleges that Franklin maintained a security interest in all of Excell's property, including but not limited to its deposit accounts, as well as the proceeds from any such collateral.  Am. Compl., ¶¶ 23, 37, 61, ECF No. 45, PageID.1104, 1109, 1113.  Franklin says that it perfected its security interests by filing a UCC-1 financing statement, *id.* at ¶ 30, PageID.1106, which generally must be filed to perfect all security interests, except as otherwise provided by statute, *see* Mich. Comp. Laws. § 440.9310(1).  Franklin further alleges that the payment Austin received from Excell under Excell's agreement with MXT contained identifiable cash proceeds from Excell's accounts receivable.  *Id.* at ¶ 61, PageID.1113.  It does not allege that Austin specifically converted proceeds from Excell's deposit accounts.

Another judge in this district, deciding a different case involving Franklin, concluded that Franklin plausibly pleaded a conversion claim because it could have perfected its security interest in proceeds from accounts receivable in a manner not governed by Section 9-312 of Michigan's

Uniform Commercial Code.  *Franklin Cap. Funding v. AKF, Inc.*, No. 19-13562, 2020 WL 3605155, at *4 (E.D. Mich. July 2, 2020).  The cases present similar facts and similar pleaded allegations, and there is no reason to depart from that reasoning.  Taking Franklin's allegations as true, Franklin plausibly has pleaded that it maintained the perfected security interest necessary to maintain its conversion claims.

Austin's motion to dismiss Counts IV and V of the amended complaint will be denied.

<div align="center">III.</div>

Turning to MXT's motion to dismiss, the defendant denies any contact with or presence in Michigan whatsoever, and it contends that there can be no general or specific personal jurisdiction over it.

The plaintiff, of course, has the burden of establishing personal jurisdiction, either through its pleaded allegations or by meeting a more documented attack with evidence of its own.  *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002); *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).  When there is no evidentiary hearing, the plaintiff's burden is "relatively slight."  *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988).  The Court will view "the pleadings and affidavits submitted . . . in a light most favorable to the plaintiff."  *Air Prods. & Controls, Inc. v. Safetech Int'l., Inc.*, 503 F.3d 544, 549 (6th Cir. 2007).  A plaintiff "can meet this burden by 'establishing with reasonable particularity sufficient contacts between [the defendant] and the forum state to support jurisdiction.'"  *Neogen*, 282 F.3d at 887 (citations omitted).

In a case where subject matter jurisdiction is based on diversity of citizenship, federal courts look to state law to determine personal jurisdiction.  *See* Fed. R. Civ. P. 4(k)(1); *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678 (6th Cir. 2012).  If a Michigan court would have

<div align="center">- 20 -</div>

jurisdiction over a defendant, so would a federal district court sitting in this state.  *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (explaining that "[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons").  Michigan law recognizes two bases for personal jurisdiction over corporations: general, Mich. Comp. Laws § 600.711, and specific (called "limited personal jurisdiction" in state law parlance), Mich. Comp. Laws § 600.715.

Michigan's so-called Long Arm Statute defines the scope of its limited personal jurisdiction.  But "[t]he Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 571 U.S. 277, 283 (2014).  Michigan interprets its Long Arm Statute to allow personal jurisdiction to extend to the limits imposed by the federal constitution.  *Michigan Coal. of Radioactive Material Users, Inc. v. !Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992).

"'Specific' or 'case-linked' jurisdiction depends on an 'affiliation between the forum and the underlying controversy.'"  *Walden*, 571 U.S. at 283 n.6 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  To satisfy the Due Process Clause, the Court must find that "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." *Id*. at 284.  "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'"  *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty*., 582 U.S. 255, 262 (2017) (quoting *Goodyear*, 564 U.S. at 919).

The defendant's physical presence within the jurisdiction is not a necessary condition for personal jurisdiction, but "the nonresident generally must have 'certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial

justice.'"  *Walden*, 571 U.S. at 284 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310,

316 (1945)).  The Sixth Circuit historically has applied three criteria to guide the minimum contacts

analysis, which it enunciated in *Southern Machine Company, Inc. v. Mohasco Industries, Inc*., 401

F.2d 374 (6th Cir. 1968):

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine*, 401 F.2d at 381.

"Purposeful availment is present where the defendant's contacts with the forum state

proximately result from actions by the defendant *himself* that create a substantial connection with

the forum state."  *Means v. United States Conference of Catholic Bishops*, 836 F.3d 643, 649 (6th

Cir. 2016) (internal quotation marks omitted).  "The defendant's conduct and connection with the

forum must be such that he should reasonably anticipate being haled into court there."  *Ibid*.

Franklin argues that the Court properly may exercise limited personal jurisdiction over

MXT under the Michigan's long-arm statute, which provides that courts may exercise jurisdiction

over corporations or their agents for "doing or causing any act to be done, or consequences to

occur, in the state resulting in an action for tort."  Mich. Comp. Laws § 600.715.  But even if that

were true, focusing solely on the conduct allege against MXT, Franklin cannot establish purposeful

availment.

In *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court explained that one must

consider whether "an individual purposefully directs activities towards the forum state with the

intent to cause harm there."  *Scotts Co. v. Aventis S.A.*, 145 F. App'x 109, 113 (6th Cir. 2005).  The

operative term is "forum state"; *Calder* does not stand for the proposition that "mere injury to a

forum resident" is "a sufficient connection to the forum." *Walden v. Fiore*, 571 U.S. 277, 290 (2014). "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Ibid.*

Franklin contends that MXT purposefully availed itself of the forum when it interfered in Franklin's assignment agreement with Austin. But remember that Excell is a Florida corporation and MXT is a Texas-based limited liability company with a single member — Austin — and submembers who all are citizens of Texas or foreign states. MXT's contacts with the forum therefore amount to an injury caused to a Michigan company when collateral was diverted from a Florida car sales company to entities in Texas. The tort here thus allegedly took place in Florida and Texas based on the allegations made in parties' briefs and in the complaint.

Michigan is only relevant to the tort insofar as Franklin happens to have its primary place of business here. "And an injury to a Michigan company is not evidence of defendant's contacts with Michigan itself." *ABG Prime Grp., LLC v. Innovative Salon Prod.*, 326 F. Supp. 3d 498, 506 (E.D. Mich. 2018) (citing *Walden*, 571 U.S. at 285 ("[O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.")). In fact, outside of Franklin's injury, there is no evidence or allegation that MXT or Austin have any contacts with Michigan whatsoever. The amended complaint does not suggest that either company does any business in Michigan, besides Austin's entering into the assignment agreement with Franklin. And it is well-established that "merely entering into a contract . . . would not, without more, establish" sufficient minimum contacts with the forum state. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1265 (6th Cir. 1996)); *see also Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723 (6th Cir. 2000) (finding no personal jurisdiction based on "the mere existence of a contract" that had nothing to do with the forum state); *NTCH-West Tenn, Inc. v. ZTE Corp.*, 761

F. App'x 485, 490 (6th Cir. 2019) ("[M]erely making a contract 'does not mean that [one] purposefully availed itself of the 'benefits and protections' of [forum] law.'" (quoting *Kerry Steel Inc. v. Paragon Industries, Inc*., 106 F.3d 147, 151 (6th Cir. 1997)).  Although Austin consented via the agreement to personal jurisdiction in Michigan, its isolated transaction with Franklin does not constitute the sufficient minimum contacts necessary for the Court to exert personal jurisdiction over a third entity — MXT — without further evidence that MXT also "envisioned continuing and wide-reaching contacts" in the forum state.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 480 (1985).  "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State."  *Walden*, 571 U.S. at 286 (citing *Burger King*, 471 U.S. at 475).  MXT's alleged affiliations with Michigan by themselves are insufficient to confer personal jurisdiction here.

Nonetheless, personal jurisdiction easily is established when MXT's alleged conduct is viewed through the lens of Franklin's *alter ego* theory.  "The alter-ego theory can subject a parent company to personal jurisdiction where 'the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction.'"  *Lyngaas v. Ag*, 992 F.3d 412, 420 (6th Cir. 2021) (quoting *Indah v. S.E.C*., 661 F.3d 914, 921 (6th Cir. 2011)).  To determine whether an entity is the *alter ego* of another for purposes of establishing personal jurisdiction, the Court applies the same test for piercing the corporate veil that it uses to determine whether *alter ego* liability applies.  *Ibid*.; *Flynn v. Greg Anthony Constr. Co*., 95 F. App'x 726, 736 (6th Cir. 2003).

Franklin plausibly pleaded that Austin and MXT were a single entity for purposes of liability for breach of contract.  And Austin has consented to personal jurisdiction in this district.

Therefore, Franklin also has alleged sufficient facts to establish that the Court may exercise personal jurisdiction over MXT as Austin's *alter ego* for the purposes of deciding Franklin's claims against MXT.

MXT's motion to dismiss for want of personal jurisdiction will be denied.

<div align="center">IV.</div>

Franklin has alleged sufficient facts in its amended complaint to support claims against Austin and MXT.  Its amended complaint states sufficient facts to allow the reasonable inference that MXT is an *alter ego* of Austin and that Austin used MXT to commit a fraud or wrong, acting as a unitary entity.  Austin consented to personal jurisdiction in this district, and the Court therefore properly may exercise personal jurisdiction over MXT as the *alter ego* of Austin.

Accordingly, it is **ORDERED** that the motion to dismiss by defendant Austin Business Finance, LLC (ECF No. 48) is **DENIED**.

It is further **ORDERED** that the motion to dismiss by defendant MXT Solutions, LLC (ECF No. 49) is **DENIED**.

<div style="margin-left:50%">
s/David M. Lawson
DAVID M. LAWSON
United States District Judge
</div>

Dated:  June 7, 2023

<div align="center">- 25 -</div>